IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT<br><br>PLAINTIFF<br><br>v.<br><br>DAVID ROSENKRANCE, FIELD MANAGER, CHALLIS FIELD OFFICE; AND BUREAU OF LAND MANAGEMENT<br><br>Defendants. | Case No. CV 09-365-E-BLW<br><br>**MEMORANDUM DECISION** |

# INTRODUCTION

The Court has before it cross-motions for summary judgment. Following oral argument, the Court took the motions under advisement. For the reasons expressed below, the Court will grant WWP's motion and deny the BLM's motion.

# SUMMARY

WWP challenges the BLM's issuance of a grazing permit to Scott Whitworth on an allotment within the boundaries of the Burnt Creek Wilderness Study Area (WSA). In 2005, this Court held that the BLM issued a permit to Whitworth on the basis of a flawed environmental analysis that failed to consider

**Memorandum Decision - 1**

sufficient alternatives. Grazing was halted on the allotment between 2005 and 2008 to give the allotment time to recover from past grazing damage.

Recently, the BLM re-issued a permit to Whitworth and allowed him to resume grazing on the allotment. WWP argues that the permit is once again based on an improper environmental analysis.

The Court agrees. While the BLM cured its earlier failure to consider sufficient alternatives, its environmental analysis fails to address whether the wilderness values of the Burnt Creek WSA – as they existed at the time the BLM recommended the area be set aside for wilderness – will be impaired by (1) the BLM's decision to allow grazing on this allotment, and (2) the cumulative effects of this decision and other grazing permitted across the entire Burnt Creek WSA.

Because the EA fails to address these issues, the BLM's decision to issue the permit based on that EA must be set aside.

## BACKGROUND

Congress identified the conservation of wilderness lands as a national priority in the Wilderness Act of 1964. *See* 16 U.S.C. §§ 1131 *et.seq.* The Act defines a "wilderness" as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. *Id.* at § 1131(c). According to the Act, a wilderness area

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.* While the Wilderness Act did not address the selection and management of such lands, Congress allocated these duties to the Secretary of the Interior and the BLM in the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.* FLPMA directed the Secretary to recommend such lands to the President who, in turn, would recommend lands to Congress for permanent designation as wilderness. *Id*. § 1782. While under review by Congress, these lands are designated as "wilderness study areas," or WSAs, managed by the BLM "so as not to impair the suitability of such areas for preservation as wilderness." *Id.* § 1782(c).

Pursuant to FLPMA, the BLM's Idaho Office issued in 1980 an Intensive Wilderness Inventory for Idaho to evaluate lands for wilderness designation under the Wilderness Act. *See AR* at pp. 5606-09. In that Inventory, the BLM described an area of 24,980 acres it called the Burnt Creek Unit as suitable for designation as a WSA. The BLM explained that "[m]an-made imprints are not substantial within the western portion of the unit" (where the Burnt Creek allotment is located). *AR*

**Memorandum Decision - 3**

at p. 5607. Further, the area contained an "outstanding" opportunity for solitude due to its "large size, excellent topographic relief, moderate vegetative screening, lack of nearby development, and remoteness." *Id.* The opportunity for primitive and unconfined recreation – including hiking, horseback riding, cross-country skiing, snowshoeing, camping and backpacking – was also deemed "outstanding" because "there are no continuing barriers or man-made developments to limit recreation activities." *Id.* Finally, the BLM highlighted the supplemental values of elk winter range and archaeological sites. *AR* at p. 5607.

Eleven years later, in 1991, the BLM formally recommended that 16,680 acres of the Burnt Creek WSA be released and that the remaining 8,300 acres be designated as wilderness. *AR* at p. 5612. Nevertheless, the BLM continues to manage the "entire 24,980 acres . . . as WSA until such time as Congress determines the area's wilderness status." *AR* at p. 4624.

This 8,300 acre portion of the Burnt Creek WSA recommended for wilderness designation offered, in the BLM's opinion, "outstanding wilderness quality, lack of conflicts with other resource uses, ease of management, and their value as an extension to the adjacent U.S. Forest Service [Borah Peak] Unit." *AR* at p. 5612. Moreover, it "offer[s] outstanding opportunities for solitude and primitive, unconfined recreation . . ., [and] is isolated from human influences that

**Memorandum Decision - 4**

occur on the adjacent non-recommended portion . . . ." *Id*. The "naturalness" of the area was described as "outstanding," with its "primitive nature . . . add[ing] a spectacular example of sagebrush- and grass-covered hills with pockets of timber giving way to awesome rugged mountains rising into the adjacent [Forest Service roadless] Area. Both areas are dominated by the 12,655-foot Borah Peak, the highest point in Idaho." *Id*. Further, "most of the sights and sounds of man are not evident or are screened out by the vegetative cover." AR 5616. The non-recommended acres were "not of the same high quality," in part because "[c]onstruction of fences would further degrade the wilderness values by lessening the visitors perception of solitude and primitive and unconfined recreation." *AR* at p.5612.

The 4,884 acre Burnt Creek allotment lies entirely within the Burnt Creek WSA, and also entirely within the 8,300 acre portion of the WSA recommended by the BLM for wilderness designation. Flowing through the allotment is Burnt Creek, a spawning habitat for bull trout, and a critical habitat for Chinook salmon and steelhead, all of which are listed as threatened species under the Endangered Species Act.

The BLM's management of this area is governed by the Challis Resource Management Plan (RMP) issued in July of 1999. In that same year, the BLM

**Memorandum Decision - 5**

prepared an EA evaluating permit renewals for 24 allotments including the Burnt Creek Allotment. In that EA, the Fish and Wildlife Service (FWS) concluded that grazing on the Burnt Creek Allotment "may affect, but is not likely to adversely affect" bull trout. *See Memorandum Decision filed September 22, 2004 in WWP v. Snyder Civ. No. 03-314-E-BLW (docket no. 36).*

Based on the 1999 EA and the 1999 RMP, the BLM renewed the grazing permit on the Burnt Creek Allotment on January 23, 2001 for ten years. But about six months later – in June of 2001 – the BLM conducted a rangeland health determination revealing that grazing on the allotment was causing the violation of four out of six applicable rangeland health standards. *AR* at pp. 385-90. Moreover, the record shows that during the summer of 2001, cattle were grazing in prohibited areas, and the stubble height requirements were not being followed. *AR* at pp. 412, 418, 419-22.

The BLM disclosed this information to the FWS. On May 15, 2002, the FWS concluded that continued grazing on the allotment would likely have an adverse affect on bull trout, and recommended that the BLM initiate formal consultation.

The BLM did so, and conducted a field study with personnel from the FWS and the permittee. During that field study, the permittee proposed moving the

grazing season away from the hot summer months and changing the kind and number of livestock to reduce the impact of the grazing.  Notes from this field study state that "the group agreed this alternative was reasonable and the BLM agreed to move forward with changing the 2002 permitted use for the allotment." *Id.*

On July 15, 2002, the BLM issued an EA analyzing the permittee's proposal. The EA also analyzed a single alternative that would maintain the status quo.  After the FWS found that the permittee's proposal "may affect, but is not likely to adversely affect" bull trout, the BLM issued a Full Force and Effect Grazing Decision that adopted the permittee's proposal and immediately renewed his grazing permit.

WWP filed suit in this Court to challenge that decision, arguing that the decision was based on an EA that failed to consider viable alternatives.  *Id*.  The only alternatives evaluated in the EA were (1) the permittee's proposal and (2) maintaining the status quo.  Because the "status quo" involved numerous violations of the rangeland health regulations, the only real "alternative" was the permittee's proposal, making the choice of that proposal a "foreordained formality."  This violated NEPA, and the Court found that the BLM's decision to renew the grazing permit on the Burnt Creek Allotment was arbitrary and capricious.  *Id.*

**Memorandum Decision - 7**

Following that ruling, grazing was not allowed on the allotment from 2005 to 2008. In 2007, the BLM determined that the allotment was meeting, or making significant progress toward meeting, all applicable standards of rangeland health. Following on that determination, the BLM drafted a proposed Burnt Creek EA that considered 5 grazing management alternatives for the allotment.

However, before the final decision on the EA was made, the BLM revealed damage done to the Burnt Creek allotment by cattle trespassing from an adjoining allotment. In 2008, the BLM assessed a penalty fee on the adjoining permit holder – Whitworth Ranches owned by Judd Whitworth – for its "repeated willful violation on the Burnt Creek Allotment." *AR* at p. 4404. Whitworth Ranches challenged the fee in an administrative action. In defending its fee, the BLM argued that despite "working with Mr. Whitworth for many years to resolve this issue," *AR* at p. 4414, his cattle made "repeated trespass" from Dry Creek onto Burnt Creek, and that "Mr. Whitworth has a history of trespass within the Challis Field Office area and specifically in the Burnt Creek allotment." *AR* at pp. 4405-06. The BLM pointed out that "[t]he riparian areas/wetlands on Burnt Creek allotment are functioning at risk with a static trend, which should be in an upward trend since the permittee for the Burnt Creek allotment has not been able to graze since 2004." *AR* at p. 4411. The Office of Hearings and Appeals stayed the

penalty fee, holding that it was too severe and ordered the parties into mediation. *AR* at pp. 4423-38.

On September 8, 2008, the BLM issued its Final Decision on the Burnt Creek grazing permit, and also issued a Finding of No Significant Impact. The Final Decision authorizes a grazing level of 670 AUMs, a figure based on "the average actual use that has occurred between 1986 and 2001 . . . ." *AR* at p. 4563. The Final Decision also authorizes several new range projects inside the WSA: (1) The relocation of about a mile of fence "onto the bench above the creek to include Burnt Creek Spring #1"; (2) The removal of a fence and corral located on the West Tributary; (3) The construction of .2 miles of temporary electric fence that "will be removed once the livestock leave the allotment;" (4) The authority to "[i]nstall annually" .27 miles of electric fence that "will be in place for approximately 45 days per year to protect [a] spring/meadow complex" and (5) The Construction of a new livestock trough and above-ground pipeline. *AR* at p. 4459. In addition, under the "Other Terms and Conditions" section of the Final Decision, the BLM states that it will allow

> [s]easonal temporary electric fence [that] may be used as tool to protect sensitive areas along the East and West tributaries of Burnt Creek and upland spring areas improve livestock distribution and enhance wilderness values by improving riparian/wetland habitat conditions. The temporary electric fence will consist of one or two strands and will be removed once the livestock leave the allotment.

**Memorandum Decision - 9**

*AR* at p. 4458.

WWP filed an administrative appeal and petition for stay of the Burnt Creek allotment final decision before the Office of Hearings and Appeals (OHA) on October 9, 2008. *AR* at p. 4727. On November 21, 2008, OHA denied the petition for stay. *AR* at p. 4769. The BLM authorized grazing turnout on the Burnt Creek allotment in June of 2009. *AR* at pp. 5690–94 (grazing bill and turnout statement).

WWP filed this action on July 28, 2009, alleging that the BLM's Final Decision violates NEPA and FLPMA, and thus should be set aside as arbitrary and capricious under the Administrative Procedures Act.

## ANALYSIS

Under FLPMA, the BLM must manage the Burnt Creek WSA "so as not to impair the suitability of such areas for preservation as wilderness." *See* 43 U.S.C. §§ 1711, 1782. FLPMA also requires that all grazing permits be consistent with the area's Resource Management Plan (RMP); hence, the Burnt Creek allotment permit must be consistent with the Challis RMP. *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1601.0-5(b), 4100.0-8.

The Challis RMP provides that, "[u]nless released by Congress from wilderness review, WSAs would continue to be managed in accordance with the BLM's Interim Management Policy and Guidelines for Lands Under Wilderness

Review (IMP). . . ." *AR* at 2115. The BLM recognized in the EA that "all actions must be in compliance with the Bureau's [IMP]." *AR* at p. 4529.

The IMP requires that an EA evaluating a project within the WSA's borders discuss and answer the following question: "If the project's impacts, including cumulative impacts, had existed at the time of the intensive inventory, would those impacts have disqualified the area or any portion of the area from being identified as WSA or from being included in WSA?" *AR* at p. 5649. To answer this question, according to the IMP, "one must refer to the original wilderness inventory for baseline or benchmark data concerning the particular wilderness values being affected." *AR* at p. 5636. The IMP requires the EA to include "[a] description of the affected environment considering both the specific site and the WSA in its entirety." *AR* at p. 5648.

Applying these requirements to the present case, the Burnt Creek EA must discuss and determine whether the impacts of this grazing permit – and the cumulative impacts of grazing throughout the WSA – impair the wilderness values set forth in the 1980 Inventory. The EA does contain a conclusion that temporary fencing would "reduce the naturalness of the WSA in the short term though improving the overall health and naturalness of the WSA over the long term." *AR* at p. 4625. This is a mere conclusion, however, and not an analysis. It does not

**Memorandum Decision - 11**

compare the fencing on the allotment to that existing during the 1980 Inventory, as required by the IMP quoted above. Moreover, it only considers a single wilderness value – naturalness – and fails to address two other relevant wilderness values named in the 1980 Inventory: (1) solitude and (2) primitive and unconfined recreation.

The EA does recognize in a general sense that fencing might impair the wilderness values of a WSA:

> These fences, none of which cause substantial direct impacts on their own, can be expected to begin resulting in cumulative impacts to the primitive character and natural setting of the Burnt Creek WSA. Currently there are approximately 14 miles of fence within the WSA with . . . additional . . . [fencing] proposed with this project. As small fencing projects begin to accumulate in [a] WSA, they can be expected to begin impacting the primitive setting of the area, the contiguous nature of the landscape and condition of the land health. One potential cumulative effect of fencing within the WSA is the creation of more noticeable human influence on the land which may begin impacting the visual and natural character of the landscape. Additionally, increased fencing may begin to result in a decline in the recreational experience on these lands. As fencing begins to divide the landscape, the recreationalists mobility throughout the WSA may be increasingly inhibited or interrupted thereby impacting the wilderness experience.

*AR* at p. 4637.

This section of the EA recognizes that fencing impairs wilderness values, and that the impairment can result from an accumulation of small fencing projects over time. The EA does not go the next step, however, and compare this project's

impacts with the 1980 Inventory baseline. The record shows that about 5 years after the 1980 Inventory, the BLM started to add fencing to the WSA, *see AR* at p. 822, and that after a number of projects over the years, there are now about 14 miles of fencing within the WSA boundaries. *AR* at p. 4637. While the EA recognizes that this accumulation of fencing *might* impair wilderness values, it fails to resolve the critical question of whether it *actually* impairs wilderness values.

The BLM counters that the fencing falls into one of the IMP's exceptions to the rule of non-impairment. *See BLM Brief* at p. 19. The IMP's discussion on fences in a WSA begins with a hypothetical example of a "mile-long drift fence" proposed for a WSA, and concludes that the proposal should be denied because it would "result in a detrimental change in the baseline condition, thereby negatively impacting the wilderness value of 'naturalness' . . . ." *AR* at p. 5637. The IMP then identifies an exception for a fence "that is intended to correct or mitigate a situation which is degrading wilderness values identified in the intensive inventory." *Id.* The IMP then goes on to discuss this exception in more detail:

> For example, domestic livestock and wild horses are altering a hot springs complex, a unique special feature of a WSA, by damaging riparian vegetation, harming an unusual aquatic community, and degrading water quality. Special consideration to design and location of an exclosure fence would be required to reduce impacts to scenic qualities. Any negative impacts to wilderness values created by this fence would be clearly offset by the positive benefits of protecting in a more natural condition a special feature of the wilderness resource.

**Memorandum Decision - 13**

*Id.* The BLM argues that "[t]he riparian exclosures and water trough authorized by the 2008 Final Decision fit squarely into the Wilderness IMP's guidelines." *See BLM Brief* at p. 10.

However, neither the EA nor the Final Decision mention this exception. Moreover, a checklist used by the BLM in preparing the EA states that no such exception applied. *AR* at p. 3411. Under the checklist's heading, "Consider Exceptions and Limitations to the Non-Impairment Standard," the BLM answered "no" to each question asking whether certain exceptions applied, including the exception for "uses and facilities that clearly protect or enhance the land's wilderness values." *Id*.

The BLM explains this denial in a Declaration filed by Peggy Ridick, the BLM's Resource Management Specialist responsible for the Burnt Creek allotment. She states that the fencing originally proposed – at the time the checklist was prepared – did not fall within the exception, but that the fencing revised and adopted in the Final Decision was within the exception. *See Ridick Declaration* at ¶¶ 4-5.

WWP seeks to strike Ridick's Declaration on the ground that it contains opinions and conclusions that are not part of the administrative record. The Court is bound by that record unless certain narrow exceptions apply. *See Ranchers*

*Cattlemen Action Legal Fund v. U.S.*, 499 F.3d 1108 (9th Cir. 2007). While the Court can consider extra-record material to explain the agency's decision, the material cannot be used to form "a new rationalization of the agency's decision." *See Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984). Ridick's opinion that the revised fencing falls within the exception is a new rationalization for the agency's decision because that opinion cannot be found in any form within the EA or the Final Decision, and is contradicted by the EA checklist. Hence this part of the Ridick Declaration must be struck.[1]

The Court is therefore left with (1) an IMP that requires the EA to compare the project to the baseline of the 1980 Inventory or identify an exception, and (2) an EA that does neither. The IMP also requires that the EA consider "both the specific site *and the WSA in its entirety*." *AR* at p. 5648 (emphasis added). The BLM has approved grazing permits on adjoining allotments, also within the Burnt Creek WSA, yet the EA fails to discuss whether grazing across the "WSA in its entirety" impairs the wilderness values identified in the 1980 Inventory.

For all of these reasons, the Court finds that the Final Decision violates FLPMA, and hence is arbitrary and capricious under the Administrative

---

[1] The BLM has also filed a motion to strike – alleging that the Declaration of Kathleen Fite should be stricken. The Court has not examined the Declaration and so declares the motion moot.

**Memorandum Decision - 15**

Procedures Act. The Court will accordingly grant WWP's motion for summary judgment and deny the Government's motion. The Court will issue a separate Judgment as required by Rule 58(a).

DATED: **July 29, 2010**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge